## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

**DEREK FUNK,**                                  )
                                                 )
        Petitioner,                   )
                                                 )
**v.**                                           )     **Case No. CIV 23-413-RAW-GLJ**
                                                 )
**MARGARET GREEN, Warden,**                      )
                                                 )
        Respondent.                    )

## OPINION AND ORDER

This action is before the Court on Respondent's motion to dismiss Petitioner's petition for a writ of habeas corpus as barred by the statute of limitations. (Dkt. 12).[1] Petitioner is a pro se state prisoner in the custody of the Oklahoma Department of Corrections, who is incarcerated at Mack Alford Correctional Center in Stringtown, Oklahoma. He is attacking his convictions in Wagoner County District Court Case No. CF-2018-134 for Aggravated Possession of Child Pornography (Count One) and Pornography--Procure/Produce/Distribute/Possess Juvenile Pornography (Count Two).

The Court has before it for consideration Petitioner's habeas corpus petition pursuant to 28 U.S.C. § 2254 with attachments (Dkt. 1), Respondent's motion to dismiss and brief in support with exhibits (Dkts. 12, 13), copies of the state court transcripts and records (Dkt. 14), and Petitioner's objection to the motion to dismiss (Dkt. 15). The Court has carefully reviewed the record and construes Petitioner's pro se pleadings liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972). This relaxed standard, however, does not relieve his burden of alleging sufficient facts on which a recognized legal claim could be based. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

---

[1] The Court's page citations refer to this Court's CM/ECF header pagination.

## I.    Background

Sgt. Jeremy Noland of the Tulsa Police Department's Cyber Crimes Unit testified at trial that he came into contact with Petitioner on June 3, 2017, and June 21, 2016, through a program used by police to identify the exchange of child pornography on file-sharing networks. (Dkt. 13-15 at 2, 4-6, Tr. I, 186, 188-90). The program maintains "a data base [sic] of info hashes that are associated with child pornography that it goes out and looks for." (Dkt. 13-15 at 6, Tr. I, 190). The program then flags transactions involving those info hashes. (Dkt. 13-15 at 7, Tr. I, 191).

Using its detection program, the Cyber Crimes Unit received 23 files from an IP address. (Dkt. 13-15 at 7-8, Tr. I, 191-92, 194). Sgt. Noland personally viewed the files, which contained videos depicting "children that were either nude or partially nude and prancing around and close up zoom-ins of their genital area, their anus, and stuff of that nature." (Dkt. 13-15 at 8, Tr. I, 192). Sgt. Noland, who had been in the Cyber Crimes Unit for three years at that time, worked 12 to 20 cases a year. (Dkt. 13-15 at 3, 8, Tr. I, 187, 192). It was not the first time he had seen imagines like that, and in his mind he had no question as to whether the media depicted child pornography. (Dkt. 13-15 at 8, 18, Tr. I, 192, 221). Sgt. Noland subpoenaed Cox Communications to ascertain the address associated with the IP address, and the company obeyed the subpoena. (Dkt. 13-15 at 9-11, Tr. I, 193-95; State's Trial Exhibits 1-2, Dkt. 14-3). Cox Communications furnished documents to the Cyber Crimes Unit, indicating that the IP address was associated with Petitioner and his residence in Broken Arrow, Oklahoma. (Dkt. 13-15 at 11, Tr. 1, 195; State's Trial Exhibit 1, Dkt. 14-3).

Having linked the IP address to Petitioner and his residence, Sgt. Noland obtained a search warrant for the premises. (Dkt. 13-15 at 11, Tr. I, 195). The Cyber Crimes Unit executed the search warrant sometime in July 2016. (Dkt. 13-15 at 11-12, Tr. I, 195-96). Petitioner was at work when

police executed the warrant.  (Dkt. 13-15 at 12, Tr. I, 196).  Sgt. Noland went to Petitioner's place of employment and interviewed him there.  (Dkt. 13-15 at 13, Tr. I, 197).  When speaking with Sgt. Noland, Petitioner avoided discussing ages of the children, saying it was not a concern of his, and he only cared about what was attractive to him.  (Dkt. 13-15 at 14, Tr. I, 199).

The Cyber Crimes Unit examined the evidence collected from Petitioner's home.  (Dkt. 13-15 at 15, Tr. I, 202).  The images depicting these children were pornographic in nature.  At least some of them bore a watermark from the "LS or Lolita Series," a known child pornography series. (Dkt. 13-15 at 39, Tr. II, 290).

Tulsa Police Corporal John Milburn, also with the Cyber Crimes Unit, conducted the forensic examination of Petitioner's devices.  (Dkt. 13-15, Tr. II, 258, 260).  He identified 122 images which depicted children "in various stages of undress."  (Dkt. 13-15 at 22-23, 24, Tr. II, 261-62, 268).  For example, Image Number 7 depicted someone who "is clearly under the age of eighteen," apparently posed, with her genitalia and breasts central to the image.  (Dkt. 13-15 at 26, Tr. II, 270).  With limited exception, "they all depicted either the genitalia or the nipples of the female subjects involved."  (Dkt. 13-15 at 36, Tr, II, 280).

The subsequent report, provided to Sgt. Nolan, included a disc containing the 122 images. (Dkt. 13-15 at 15, Tr. I, 202).  Sgt. Noland took the disc to Dr. Sarah Passmore of the Tulsa Children's Advocacy Center.  Dr. Passmore is a pediatrician who had been the medical director of the University of Oklahoma's Youth Services of Tulsa Clinic since 2001.  (Dkt. 13-15 at 40-42, Tr. II, 304-06).  Dr. Passmore completed a residency in general pediatrics after graduating from Oklahoma State University's medical school, followed by a fellowship specializing in child abuse and pediatrics.  (Dkt. 13-15 at 41, Tr. II, 305).  Based upon her training and experience--she had

3

reviewed possible child pornography for law enforcement dozens of times-- Dr. Passmore rated the children depicted in the images on the disc provided by Sgt. Noland as 1 or 2 on the sexual maturity scale. (Dkt. 13-15 at 42-44, Tr. II, 306-07; State's Trial Exhibit 5, Dkt. 14-3 at 8-9). Sexual maturity rating 1 ("SMR-1") relates to children who had not yet entered sexual maturity at all. (Dkt. 13-15 at 43, Tr. II, 307). SMR-2 relates to children who have entered puberty, but still had three additional stages to go before being fully developed adults. (Dkt. 13-15 at 307, Tr. II, 307). The median age for someone at SMR-2 is 10.9 years, with a standard deviation range from 8.9 to 12.9. (Dkt. 13-15 at 45, Tr. II, 309; State's Trial Exhibit 5, Dkt. 14-3 at 9). When Dr. Passmore used the terms "SMR-1" and "SMR-2," she was referring to children who definitively were under the age of eighteen. (Dkt. 13-15 at 310, Tr. II 310). Dr. Passmore's report indicated that the images maintained by Petitioner overwhelmingly depicted young children:

> Overall, the girls in the images provided range from SMR stage 1-4 in their development. Only one girl was SMR stage 4, all of the other girls were SMR 1 and 2. Each photo contains one girl except for the last one which has two, one of which is the more mature girl. There are only a few girls total depicted in the photos and there are many views of each girl so *it is clear that the girls are young children*. This assessment of the children is made based on the appearance of their faces, teeth, body habitus, breasts and genitals.

(State's Trial Exhibit 5, Dkt. 14-3 at 8-9) (emphasis added). According to Dr. Passmore, there was no possibility that any of the children depicted in the media collected from Petitioner's home could have been eighteen years old. (Dkt. 13-15 at 45-46, Tr. II, 309-10).

Petitioner testified that he did not believe he had been downloading child pornography. (Dkt. 13-15 at 49-50, Tr. II, 319-20). Although he claimed he never intended to break the law, Petitioner conceded that he was aware that he had accessed the images in question and that they were on his computer or other devices. (Dkt. 13-15 at 50-51, Tr. II, 320-21). He also testified that his concern

was not that he had come into contact with the products of child exploitation, but that "some people may disagree with them." (Dkt. 13-15 at 62-63, Tr. II 347-48). He agreed that images of children that came up in his computer searches for adult pornography could be considered child pornography. (Dkt. 13-15 at 63, Tr. II, 348). He also conceded that some of the images shown to the jury "were centered on [the subject's] vagina and their anus area." (Dkt. 13-2 at 118, Tr. II, 350).

Petitioner testified that he "had seen similar images that are in public domain or readily available through art and Amazon." (Dkt. 13-15 at 51, Tr. II, 321). He likened the images found on his computer as being akin to the cover art for Led Zeppelin's *Houses of the Holy* album, Nirvana's *Nevermind* album, and Soul Asylum's *Grave Dancers Union* album. (Dkt. 13-15 at 51-52, 53, 54-55, Tr. II, 321-22, 325, 326-27). He also compared the images to the art of Sally Mann, Robert Mapplethorpe, and Jacques Sturridge. (Dkt. 13-15 at 56-58, Tr. I, 337-39). The gist of Petitioner's testimony was that he believed he was an art connoisseur--not a pedophile. (Dkt. 13-15 at 59, 62, Tr. II, 341, 347). Although he admitted to masturbating when coming upon the images found on his devices, he testified that he would stop, "close out that and move on to the next [image]." (Dkt. 13-15 at 60, 61, Tr. II, 343, 346). Petitioner later admitted on cross- examination that none of the album covers mentioned, nor any of the art by the previously mentioned artists, were on his devices. (Dkt. 13-15 at 63, Tr. II, 348).

## II.   Petitioner's Habeas Corpus Claims

Petitioner sets forth the following grounds for relief:

**Ground One:**   Petitioner is factually innocent of the crimes of which he was convicted.

**Ground Two:** Petitioner's trial counsel was ineffective throughout the proceedings leading up to and throughout the trial, however, under the circumstances, no lawyer

could have provided competent legal representation.  The Oklahoma legislature created an impediment to all criminal defendants accused of possession, distribution, or solicitation of child pornography by not allowing defense counsel the ability to properly investigate the State's case.

**Ground Three:**  Petitioner did not receive competent and effective representation through his direct appeal.

**Ground Four:**  The State of Oklahoma created an impediment to Petitioner's speedy trial rights.

## III.    Statute of Limitations

Respondent alleges the petition was filed beyond the one-year statute of limitations imposed

by the Antiterrorism and Effective Death Penalty Act of 1996, codified at 28 U.S.C. § 2244(d)

(AEDPA).   The AEDPA gives state prisoners a one-year statute of limitations to seek a writ of

habeas corpus from federal courts as follows:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2)  The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

    **A.**    **Untimeliness Under 28 U.S.C. § 2244(d)(1)(A).**

Petitioner was tried by jury and convicted and sentenced in Wagoner County District Court Case No. CF-2018-134.   (Dkt. 13-5 at 7-8).  He appealed the convictions to the Oklahoma Court of Criminal Appeals ("OCCA"), which affirmed his Judgment and Sentence in *Funk v. State*, No. F-2019-214 (Okla. Crim. App June 11, 2020) (unpublished).  (Dkt. 13-1).  From that point, Petitioner typically would have had 90 days to seek certiorari with the United States Supreme Court. *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009); *See* Sup. Ct. R. 13(1).  There was, however, a series of Supreme Court orders regarding COVID-19 deadlines, extending the deadline to 150 days for certiorari petitions due on or after March 19, 2020, and that extended deadline continued to apply as to lower court orders filed any time prior to July 19, 2021, on which date the extended deadline was rescinded.  *See* Thursday, March 19, 2020, Order, 589 U.S. ___ (2020); Monday, July 19, 2021, Order, 594 U.S. ___ (2020).  Therefore, Petitioner had until Monday, November 9, 2020, to seek certiorari, but he did not do so. (Doc. 1 at 9).

Petitioner's AEDPA statute of limitations began running the next day, Tuesday, November 10, 2020.  *Jimenez,* 555 U.S. at 119.  Absent any tolling event, Petitioner's statute of limitations expired on Wednesday, November 10, 2021.  *See United States v. Hurst*, 322 F.3d 1256, 1260 (10th Cir. 2003) (applying anniversary method to calculate limitations period).  This petition, which was filed more than a year later on November 16, 2023, is untimely.  (Dkt. 1 at 61).

    **B.**    **Statutory Tolling Under 28 U.S.C. § 2244(d)(2).**

Pursuant to 28 U.S.C. § 2244(d)(2), the statute of limitations is tolled while a properly-filed application for post-conviction relief or other collateral review of the judgment at issue is pending.

State procedural law determines whether an application for state post-conviction relief is "properly filed." *Garcia v. Shanks*, 351 F.3d 468, 471 (10th Cir. 2003).

Petitioner filed his first application for post-conviction relief with the Wagoner County District Court on February 22, 2022, after the limitations period had expired. (Dkt. 13-6). The sole issue presented in the application was that of speedy trial. *Id*. The state district court issued an order denying relief on April 5, 2022. (Dkt. 13-7). Petitioner, however, failed to properly perfect an appeal of that decision. (Dkt. 13-11, Order Declining Jurisdiction in OCCA Case No. HC-2022-405).

Petitioner filed a second post-conviction application in the Wagoner County District Court on June 22, 2022. (Dkt. 13-12). He presented seven claims of error: (1) "The State of Oklahoma's charged statute(s) are unconstitutionally created, enacted, and enforced[;]" (2) "the Charged Oklahoma Penal Statute is unconstitutional[;]" (3) "the State Penal Statutes are VOID-for-VAGUENESS[;]" (4) "Appellate Counsel's performance was ineffective for failure to raise constitutional question(s) and his Actual-Factual Innocence within his DIRECT APPEAL[;]" (5) the state district court "was and is without jurisdiction to issue any warrant(s) for the search and/or seizure of property within Indian Country[;]" (6) "Petitioner is seeking a DEMURRER to the charges as he is ACTUALLY-FACTUALLY INNOCENT of any and all charges[;]" and (7) "the Wagoner County District Attorney's Office knowingly and willingly concealed BRADY MATERIAL[.]" (Dkt. 13-12 at 2, 4, 6, 8, 10, 12, 16) (emphasis removed; capitalization, and syntax in original). The district court denied relief on November 22, 2022 (Dkt. 13-13), and the the OCCA affirmed on January 6, 2023 (Dkt. 13-14).

As shown above, all of Petitioner's post-conviction proceedings occurred after the deadline

for filing a federal habeas petition had passed.  Therefore, there can be no statutory tolling of the statute of limitations under § 2244(d)(2).

### C.    Construing the Petition to Assert 28 U.S.C. § 2244(d)(1)(B)

Petitioner argues that his "petition was timely filed "upon the completion of [his] due diligence into [his] actual innocence." (Dkt. 1 at 57).  As an initial matter, he mentions that the "lack of access to the world behind bars" when explaining the delay in presenting his claim.  *Id.* at 18-19. Respondent contends this assertion could be construed as alleging a state-caused impediment.  (Dkt. 13 at 15) (citing *Childers v. Crow*,  1 F.4th 792, 798 (10th Cir. 2021)).

It is well-settled that inmates possess a constitutional "right of access to the courts." *Lewis v. Casey*, 518 U.S. 343, 350 (1996) (emphasis removed). That said, they do not have "an abstract, freestanding right to a law library or legal assistance."  *Id.* at 351.  Therefore, to avail himself of a later commencement date under § 2244(d)(1)(B), it is Petitioner's burden to show this Court, with specificity, that the denial of access to legal resources prevented him from filing a timely petition for habeas corpus.  *See Miller v. Marr*, 141 F.3d 976, 978 (10th Cir. 1998) ("It is not enough to say that the [prison] lacked all relevant statutes and case law or that the procedure to request specific materials was inadequate.").  Conclusory assertions of inadequate access to legal resources are insufficient to trigger a new commencement date under § 2244(d)(1)(D).  *Garcia v. Hatch*, 343 F. App'x 316, 318-19 (10th Cir. 2009) (unpublished).  *See also Weibley v. Kaiser*, 50 F. App'x. 399, 403 (10th Cir. 2002) ("Weibley's claim is insufficient because he does not allege specific facts that demonstrate how his alleged denial of these materials impeded his ability to file a federal habeas petition."); *United States v. Martinez*, 303 F. App'x 590, 596 (10th Cir. 2008) (unpublished) ("Mr. Martinez has not provided this Court with specific details regarding what restrictions actually were

9

placed on his access to legal materials or how such restrictions hindered his ability to file his § 2255

motion," therefore, he is not entitled to equitable tolling).

Here, Petitioner has failed to provide the Court with any specific facts to show that the

conditions of his confinement prevented timely filing.  Instead, as stated above, he refers in general

to a "lack of access to the world" resulting from his incarceration.  (Dkt. 1 at 18).  Such a complaint

is the type of general complaints about access that have been rejected by the Tenth Circuit.  *See*

*Miller*, 141 F.3d at 978.  Without the assertion of facts specifically tying a denial of access to the

tardiness of his petition, this Court cannot apply § 2244(d)(1)(B) to Petitioner's case.  *Garcia*, 343

F. App'x at 318-19.

Petitioner also claims there were "impediment(s) caused and created by the Oklahoma

legislature," which he argues "hindered and obstructed" his ability to present his actual innocence

claim.  Petitioner's actual innocence claim is based on the premise that all the children depicted in

the 23 videos and 122 images are actually adults who suffer from a rare hormone disorder called

Kallmann Syndrome ("KS") that delays or inhibits puberty. (Dkt. 1 at 20-24).  He complains that the

State of Oklahoma has "created statute(s) to protect law enforcement and prosecutor(s) when they

are investigating child pornography case(s) while failing to protect defense lawyers." (Dkt. 1 at 20).

Based on this statement, it appears that Petitioner is arguing that neither he nor his attorney had

access to the 23 videos or 122 images before trial, and his continued lack of access impeded his

ability to prove the actual innocence claim.  (Dkt. 1 at 20-22).  Petitioner also complains that neither

he nor his attorney was provided with the identities of the children depicted in the images.  (Dkt. 1

at 21-22).

Respondent points out that the problem with Petitioner's advancing these claims under  §

2244(d)(1)(B) is that the alleged impediments did nothing to prevent him from filing the petition. *Cf. Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) ("Even though Mr. Lloyd apparently has not yet received the transcripts he sought, he was able to raise the issue of prosecutorial misconduct in his federal habeas corpus petition.").   The very fact that Petitioner has presented the present petition belies any claim that his lack of access to the child pornography he once possessed, or the identities of the victims, constitutes an impediment under § 2244(d)(1)(B).  *Cf. Felder v. Johnson*, 204 F.3d 168, 171 n.9 (5th Cir. 2000) ("[Felder's] filing his petition prior to September 1997, the time he alleges he had access to AEDPA, would also appear to make § 2244(d)(1)(B) unavailable to [him]."). It must be also emphasized that Petitioner himself asserts a diagnosis of the claimed hormone disorder "requires a physical examination with blood work."  (Doc. 1 at 24).  Petitioner ultimately fails to explain how access to the evidence in question would be necessary to filing this petition.  While he may believe his claim would be stronger with access to the child pornography recovered from his devices, and the identities of the children depicted in those images, his lack of access to either clearly has not prevented him from filing his petition in this Court.

More important, most of Petitioner's assertions about the lack of access are simply untrue. Trial counsel's January 29, 2019, motion in limine stated that he "was allowed to review the photographs and videos submitted into evidence by the prosecution." (Dkt. 13-16 at 2).  Indeed, it was based on his review of the child pornography produced by the State that counsel argued that "none of the images or videos contains sexual conduct." *Id.*  The same images were published in open court (Dkt. 13-15 at 25-26, Tr. II, 269-80), as were the 23 videos (Dkt. 13-15 at 47-48, Tr. II, 316-17).  Of course, Petitioner also had unfettered access to those images until the time he was arrested for possessing them. (Dkt. 13-15 at 50-51, Tr. II, 320-21).  And given that the premise of

Petitioner's actual innocence claim is that those depicted in the 23 videos and 122 images only looked like children because of a rare hormone disorder, he fails to explain why further access to those materials is a prerequisite to filing a § 2254 petition with this Court.  (Dkt. 1 at 21- 24). Respondent contends that Petitioner has seen the child pornography found on his devices enough times.[2]

Respondent asserts there is no evidence suggesting that law enforcement ever knew the identities of the children depicted in the videos and images found on Petitioner's devices.   Sgt. Noland described the course of his investigation in detail at trial, but he never testified that they sought or learned the identities of the children depicted in the 122 pictures.  (Dkt. 13-15 at 6-13, 15; Tr. I, 190-197, 202; Tr. II, 260-62, 304-05).[3]

Cpl. Tom Milburn, the forensic examiner, testified that he did not know if any of the children depicted in the 122 images were cross-referenced with databases managed by other law enforcement agencies to ascertain the identities of the victims.  (Dkt. 13-15 at 37-38, Tr. II, 286-87).  Sgt. Jeremy Noland resisted trial counsel's inquiry on that point; he explained that there would be no point in cross-referencing those depicted with those previously identified in child pornography, because they still were images of children.  (Dkt. 13-15 at 16-17, Tr. I, 218-19).  Noland found it preferable to obtain a doctor's opinion to determine the victim's age.   (Dkt. 13-15 at 17, Tr. I, 219).

---

[2] The OCCA's rules provide for the retention of child pornography evidence under seal until the completion of judicial review.  Rule 2.2(G), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2024).  Those materials are viewable upon an order of the OCCA for the district court.  *Id.*  Petitioner does not indicate to this Court what--if any-- efforts he has made to access the materials at issue.  (Dkt. 1 at 20-21).

[3] Respondent points out that the prosecution has no duty to gather evidence from third parties. *See United States v. Combs*, 267 F.3d 1167, 1173 (10th Cir. 2001).

Consequently, Dr. Passmore's report was used. (Dkt. 13-15 at 40-42, 45-46; Tr. II, 304-06, 309-10; State's Trial Exhibit 5, Dkt. 14-3 at 8-9). Sgt. Noland also testified that he had not checked the videos initially obtained from Petitioner's IP address with any database to identify the children depicted. (Dkt. 13-15 at 16, Tr. I, 218). Therefore, to the extent that Petitioner's ability to file a petition was impeded by not knowing the identities of the children depicted in the pictures found on his devices, the record does not show that it was state-caused impediment.

Ultimately, the petition could be read to assert multiple state-created impediments which might be construed to implicate 28 U.S.C. § 2244(d)(1)(B). (Dkt. 1 at 20-22). The Court finds that neither his alleged challenges in searching for a viable claim of innocence while incarcerated, his lack of access to the child pornography presented as evidence against him, nor his knowledge of the identities belonging to the children depicted in the pornography, constitute state-created impediments under 28 U.S.C. § 2244(d)(1)(B). *Cf. Felder*, 204 F.3d at 171 n.9. Therefore, § 2244(d)(1)(B) cannot apply.

### D.      Construing the Petition to Assert 28 U.S.C. § 2244(d)(1)(D).

Petitioner maintains that his "habeas petition was timely filed upon the completion of [his] due diligence into [his] actual innocence." (Dkt. 1 at 57). The Court construes this argument as a claim for a commencement date under § 2244(d)(1)(D). A claim under § 2244(d)(1)(D) is dependant upon when Petitioner could have ascertained the facts giving rise to his claim. *See, e.g., Taylor v. Martin*, 757 F.3d 1122, 1124 (10th Cir. 2014) ("The 'factual predicate' of Mr. Taylor's claim is that Mr. Cheatham lied when he testified on May 6, 2009, not that he swore out an affidavit to that effect in August 2011.").

The Court finds that § 2244(d)(1)(D) cannot apply here because all the facts giving rise to

Petitioner's actual innocence claim were available before trial. The premise of Petitioner's actual innocence claim is that the children depicted in the 122 images recovered from the devices at his home all suffered from KS. (Dkt. 1 at 20-26). According to Petitioner, this condition was first described in 1944 and has been documented as early as 1956. *Id*. at 21. And, as noted above, trial counsel had access to the images used against Petitioner at trial. (Dkt. 13-16 at 38). Petitioner himself admitted to viewing the same images. (Dkt. 13-15 at 50-51, Tr. II, 320-21). They also were published in open court at his trial. (Dkt. 13-15 at 25-63, Tr. II, 269-80). Therefore, Petitioner is not entitled to relief under § 2244(d)(1)(D).

### E.   Equitable Tolling

Equitable tolling of § 2244(d)(1)'s one-year statute of limitations is available "only in rare and exceptional circumstances." *York v. Galetka*, 314 F.3d 522, 527 (10th Cir. 2003). "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)) (internal quotation marks omitted). The petitioner carries the strong burden of establishing equitable tolling. *Yang v. Archuleta*, 525 F.3d 925, 928-29 (10th Cir. 2008).

A review of the record shows that Petitioner has not exercised the necessary diligence. "The diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.'" *Holland*, 560 U.S. at 653 (internal citation and quotation marked omitted). Although Petitioner claims he exercised diligence, the record does not support that assertion. (Dkt. 1 at 20-21). *See Malone v. Oklahoma*, 100 F. App'x 795, 798 (10th Cir. 2004) (unpublished) (petitioner's "use of the relevant legal buzz words" was insufficient for equitable tolling when "he fails to supply the

factual background necessary to support his conclusory allegations").

Petitioner's claim of diligence seems to rest on efforts he put into researching his actual innocence claim.  (Dkt. 1 at 18-19).  The most obvious indication that Petitioner has failed to diligently pursue his claims, however, lies with the unexplained delay in his seeking post-conviction relief.  The OCCA affirmed on June 11, 2020 (Dkt. 13-1), but Petitioner did not initiate post-conviction proceedings until February 22, 2022.  (Dkt. 13-6).  Here, the Court finds the 20-month delay shows that whatever efforts he exercised reflect something less than reasonable diligence.  *Cf. Levering v. Dowling*, 721 F. App'x 783, 788 (10th Cir. 2018) (unpublished) (petitioner failed to show diligence by waiting to "seek any post-conviction relief until one month before his AEDPA deadline expired").

Further, Petitioner cannot show extraordinary circumstances.  The extraordinary circumstances requirement contemplates "uncontrollable circumstances" which prevent[] a petitioner's filing, despite his diligent efforts, or the petitioner's filing of a defective petition, despite his active pursuit of judicial remedies."  *Lopez v. Trani*, 628 F.3d 1228, 1230 (10th Cir. 2010).  In contrast, a petitioner's ignorance of the law, or of the burden of preparing a claim, is far from extraordinary.  *See Marsh v. Soares*, 223 F.3d 1217, 1220 (10th Cir. 2000) ("[I]t is well established that ignorance of the law, even for an incarcerated pro se petitioner, generally does not excuse prompt filing." (internal quotation marks omitted)); *Huber v. Young*, Case No. 3:14-CV-03007-RAL, 2015 WL 300425, at *3 (D.S.D. Jan. 22, 2015) (unpublished) (time needed to prepare a state habeas petition because it was factually and legally complex, containing roughly 5,000 pages of trial transcripts, did not constitute an extraordinary circumstance).  Indeed, limited access to legal resources "are ordinary circumstances for many prisoners."  *Owens v. Whitten*, 637 F. Supp. 3d 1245,

1254 (N.D. Okla. 2022). The realities of researching and developing a claim while incarcerated have never been extraordinary circumstances for the purposes of equitable tolling. Petitioner's complaint that he has had a "lack of access to the world" while "behind bars" is not extraordinary and does not warrant equitable tolling. (Dkt. 1 at 18-19).

## IV.   Actual Innocence

Petitioner alleges his untimely habeas petition should be considered by way of the actual innocence gateway. (Dkt. 1 at 4). "A claim of actual innocence may toll the AEDPA statute of limitations." *Laurson v. Leyba*, 507 F.3d 1230, 1232 (10th Cir. 2007) (citing *Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000)). A petitioner's claims of innocence, however, must amount to a "colorable showing of factual innocence." *Demarest v. Price*, 130 F.3d 922, 941 (10th Cir. 1997).

> Such a showing does not in itself entitle the petitioner to relief but instead serves as a "gateway" that then entitles the petitioner to consideration of the merits of his claims. *Brecheen v. Reynolds*, 41 F.3d 1343, 1357 (10th Cir. 1994) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). In this context, factual innocence means that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Murray v. Carrier*, 477 U.S. 478, 496 ("[W]e think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."). Factual innocence requires a stronger showing than that necessary to establish prejudice. *Schlup*, 513 U.S. at 326.

*Demarest*, 130 F.3d at 941-42. Moreover, the Supreme Court has recognized that "'[a]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (citing *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

To that end, the Tenth Circuit has observed that, "[t]o be credible, a claim of actual innocence requires a petitioner to present new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial."

16

*Fontenot v. Crow*, 4 F.4th 982, 1031 (July 13, 2021) (quoting *Schlup*, 513 U.S. at 324) (internal quotes omitted).  When it comes to assessing the petitioner's showing, "the habeas court must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial[.]" *Fontentot*, 4 F.4th at 1031-32 (internal citations and quotes omitted).  Thus, this inquiry "requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Id*. (internal quotes and citations omitted).

Before discussing the merits of Petitioner's actual innocence claim, the Court finds his delay in presenting the claim should be addressed.  In *McQuiggin v. Perkins*, 569 U.S. 383, the Supreme Court observed that lack of diligence, "although not an unyielding ground for dismissal of a petition, does bear on the credibility of evidence proffered to show actual innocence." *Id.*. 569 U.S. at 383. *See also Fontenot*, 4 F.4th at 1033-34 (looking to "a habeas petitioner's unjustifiable delay in presenting new evidence" as a factor in discerning whether a petitioner has shown actual innocence).

Respondent argues that "while Petitioner may be short on evidence, he is not short of unsupported assertions." (Dkt. 13 at 26).   Petitioner erroneously asserts his trial counsel lacked access to the evidence used against him at trial. (Dkt. 1 at 18, 20-22).  He also tells this Court how he came upon the child pornography that he distributed and possessed, "through a simple and innocent Google search," claiming for the first time that the prosecution "concealed" his search history and prevented  him access to it.  (Dkt. 1 at 26).

Respondent maintains that "Petitioner's delay in presenting this late-coming and self-serving narrative of withheld and concealed evidence beggars credulity." (Dkt. 13 at 26 (citing Dkt. 1 at 28)).  Petitioner waited almost two years before filing any challenge to his convictions.  (Dkts. 13-1,

17

13-5 at 12; Dkt. 13-6).  While Petitioner contends that the conditions of his confinement hindered timely filing, he fails to specifically articulate anything beyond the ordinary challenges faced by every inmate.  The Court also notes that Petitioner's first post-conviction application claimed only a violation of his right to a speedy trial.  (Dkt. 13-6).  It was only in the second application, filed on June 22, 2022, that Petitioner claimed actual innocence.  (Dkt. 13-12 12).  Here, the Court finds Petitioner has not diligently pursued his innocence claim.

As discussed above, Petitioner argues that the children depicted in the 23 videos and the 122 images actually were adults who suffered from Kallmann Syndrome, a rare hormone disorder, which delays or inhibits puberty.  (Dkt. 1 at 21-26).  He, however, has offered no evidence to the Court to support this claim.  Although Plaintiff relies on his discovery of the medical condition (Dkt. 1 at 21-28), he has presented no evidence that the children depicted in the images recovered from his devices actually suffered from this condition.  Instead, he makes the following speculative argument:

> The State presented fraudulent testimony to the jury. Which was the testimony of an unqualified pediatrician and the State knows they are required to investigate their own witnesses to ensure their testimony is accurate. Had the jury heard testimony from an endocrinologist the outcome of the jury's findings of facts and conclusion of guilt or innocence would have been significantly impacted.

(Dkt. 1 at 27).

Respondent correctly points out that the problem with Petitioner's argument is that it does not rely on the presentation of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evident--that was not presented at trial."  (Dkt. 13 at 28 (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)).  *See also Fontenot*, 4 F.4th at 1031.  The Supreme Court has further noted that "[b]ecause such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful."  *Schlup*, 513 U.S. at 324.  The Court finds Plaintiff's unsupported

18

and speculative allegations fail to meet the high burden set by the Supreme Court for federal courts to find a showing of actual innocence. *See Strader v. Kansas*, 798 F. App'x 222, 223-24 (10th Cir. 2019) (affirming district court's rejection of petitioner's "assertion of actual innocence because it entailed nothing more than bare assertions unsupported by the kinds of evidence mandated by *Schlup*."); *United States v. McIntosh*, 676 F. App'x 792, 795 (10th Cir. 2017) (denying petitioner's unsupported claims that witnesses lied at trial, because he provided "no new evidence"); *Thames v. Chapman*, 479 F. App'x 808, 810 (10th Cir. 2012) ("Thames has not produced evidence that would compel any reasonable jurist to conclude that he is actually innocent."). *See also McCants v. Alves*, 67 F.4th 47, 54 (1st Cir. 2023) ("[W]e think something more is needed than the unsupported and speculative conclusion [petitioner] attempts to draw.").

Petitioner apparently is asserting that KS delays or inhibits puberty, and that a child under the age of eighteen years would be practically indistinguishable from someone who has this rare condition. (Dkt. 1 at 21-22). Respondent argues the following:

> [E]ven if every person depicted in the 122 images recovered from his devices actually suffered the condition, the question still remains as to the age of those depicted. . . . For Petitioner's theory to hold water, he would need to *present evidence* showing that (1) those depicted in the 122 images recovered from his devices suffered KS; and (2) they were older than the age of eighteen at the time the pornography was recorded. *Fontenot*, 4 F.4th at 1031; *Schlup*, 513 U.S. at 324. *See* Okla. Stat. tit. 22, § 1024.1(A) (Supp. 2012) (defining "child pornography" as "any visual depiction or individual image . . . wherein a minor under the age of eighteen (18) years is engaged in . . . any lewd exhibition . . . of the uncovered genitals, buttocks or, if such minor is a female, the breast, [for] the purpose of sexual stimulation of the viewer . . ."). Petitioner himself claims that the only way to prove the former is with "a physical examination and blood work." [Dkt. 1 at 24]. He has certainly failed to produce that. [Dkt. 1]. Equally, Petitioner also has failed to present anything suggesting that the victims depicted in either the 23 videos or 122 images were older than the age of eighteen.

(Dkt.13 at 28-29) (emphasis in original).

After careful review, the Court finds that, in contrast to Petitioner's supposition, the State presented overwhelming evidence regarding the status of the victims.  First, the Tulsa Police obtained the 23 videos from Petitioner's IP address by using "info hashes" previously associated with child pornography.  (Dkt. 13-15 at 6; Tr. I, 190).  After examining the videos, Sgt. Noland had no doubt as to whether they depicted child pornography.  (Tr. 13-15 at 8; Tr. I at 192).

Second, Cpt. Milburn testified that at least some of the images featured logos identifying them as part the "LS or Lolita Series," which he recognized from his training and experience to be a child pornography series.  (Dkt. 13-15 at 39, Tr. II, 290).  Next, Dr. Passmore estimated that, with limited exception, all of the children depicted had a sexual maturity scale of 1 or 2.  (Dkt. 13-15 at 45, Tr. II, 309; State's Trial Exhibit 5, Dkt. 14-3 at 8-9).  None of the children depicted were found to be over the age of eighteen.  (Dkt. 13-15 at 45-46, Tr. II, 309-10; Dkt. 14-3, State's Trial Exhibit 5, Dkt. 14-3 at 8-9).  Finally, Petitioner admitted that the images could be considered child pornography.  (Dkt. 13-15 at 63, Tr. II, 348).

Petitioner appears to discount Dr. Passmore's evaluation of the photographs, claiming that a diagnosis of KS "requires a physical examination with blood work."  (Dkt. 1 at 24).  While there was no in-person examination of the children in the photographs, Dr. Passmore did assess the photographs of the children, based on the appearance of their faces, teeth, body habitus, breasts, and genitals."  (State's Trial Exhibit 5, Dkt. 14-3 at 9).  There was nothing from her assessment to suggest that those depicted in the 23 videos or 122 images were anything other than young children. (Dkt. 13-15 at 41-46, Tr. II, 305-10; State's Trial Exhibit 5, Dkt. 14-3 at 9).

Petitioner's attachment to the petition, which appears to be an article concerning Kallmann Syndrome from the National Organization for Rare Disorders, notes a series of "[c]ommonly

20

recognized non-reproductive features that may be present . . . [s]hort metacarpals (short fingers, especially the 4th finger) . . . and [s]coliosis (bent spine)." (Dkt. 1 at 62, 65-66). The other article, apparently from Wikipedia, notes that those suffering KS also may display symptoms including split hands or feet, missing teeth, and eye defects. (Dkt. 1 at 76, 78). Neither Dr. Passmore's report, nor her trial testimony, indicated the presence of any of these commonly recognized features. (Dkt. 13-15 at 41-46, Tr. II, 305-10; State's Trial Exhibit 5, Dkt. 14-3 at 8-9). Petitioner presumably would have remembered if the subjects in the 23 videos transmitted to Tulsa Police, or the 122 images recovered from his devices, featured cleft lips or palates, short fingers, bent spines, split hands or feet, missing teeth, or eye defects. (Dkt. 13-15 at 25-36, 50-51, Tr. II, 269-80, 320-21). In fact, the only feature of KS in which Petitioner appears interested is the delayed or inhibited development of secondary sexual characteristics that comes with puberty. (Dkt. 1 at 21-26). Given the absence of any evidence suggesting the presence of these other pathologies, this Court lends greater weight to Dr. Passmore's assessment than Petitioner's.

## V.  Conclusion

To properly assess the strength of Petitioner's claim of actual innocence, this Court "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial[.]" *Fontenot*, 4 F.4th at 1031-32 (internal citations and quotes omitted). This "innocence inquiry requires a holistic judgment about all the evidence, and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Id.* at 1032 (internal quotes and citations omitted). The most Petitioner offers here is little more than wishful thinking against overwhelming evidence, including the professional opinion of an experienced pediatrician. (Dkt. 1 at 20-26; Dkt. 13-15 at 305-07, Tr. II,

305-10; State's Trial Exhibit 5, Dkt. 14-3 at 8-9). Taken as a whole, Petitioner cannot show that "it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327). Accordingly, Petitioner's claim of actual innocence must be denied, and Respondent's motion to dismiss the petition as time-barred (Dkt. 12) must be granted.

## V.    Certificate of Appealability

The Court further finds Petitioner has failed to make a "substantial showing of the denial of a constitutional right," as required by 28 U.S.C. § 2253(c)(2). In addition, he has not shown "at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether [this] court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Therefore, a certificate of appealability cannot be issued.

**ACCORDINGLY**, Respondent's motion to dismiss Petitioner's petition for a writ of habeas corpus (Dkt. 12) is granted, and Petitioner is denied a certificate of appealability.

**IT IS SO ORDERED** this 18th day of September 2024.

_____
HONORABLE RONALD A. WHITE
UNITED STATES DISTRICT JUDGE